# IN THE UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

| | |
|---|---|
| **NORMA SPRINGER,** ) | |
| ) | **Civil Action No.: _____** |
| **Plaintiff,** ) | |
| ) | |
| v. ) | **JURY DEMAND** |
| ) | |
| **METROPOLITAN GOVERNMENT OF** ) | |
| **NASHVILLE & DAVIDSON COUNTY** ) | |
| acting by and through **THE ELECTRIC** ) | |
| **POWERBOARD** of said ) | |
| **GOVERNMENT d/b/a NASHVILLE** ) | |
| **ELECTRIC SERVICE,** ) | |
| ) | |
| **Defendant.** ) | |

## COMPLAINT

Plaintiff, Norma Springer, by and through her undersigned counsel, hereby files this Complaint for relief against the Defendant, Metropolitan Government of Nashville & Davidson County acting by and through the Electric Power Board of said Government d/b/a Nashville Electric Service, and alleges as follows:

### NATURE OF THE CASE

1. This is a lawsuit brought by the Plaintiff, Norma Springer, seeking permanent relief from unlawful discriminatory and retaliatory practices committed against her by the Defendant. The Plaintiff has been affected by disability discrimination and retaliation as set forth in claims below. The practices committed by the Defendant violate the Americans with Disabilities Act ("ADA"), as amended, 42 U.S.C. § 12101, et seq.

## JURISDICTION AND VENUE

2. This Court has jurisdiction pursuant to the following statutes:

   a. 28 U.S.C. § 1331, which gives district courts original jurisdiction over civil actions arising under the Constitution, laws or treaties of the United States;

   b. 28 U.S.C. § 1343 (3) and (4), which gives district courts jurisdiction over actions to secure civil rights extended by the United States government;

3. Venue is appropriate in this judicial district under 28 U.S.C. § 1391(b) because the events that gave rise to this Complaint occurred in this district.

## PARTIES

4. Plaintiff, Norma Springer (hereinafter referred to as "Plaintiff" or "Ms. Springer"), is a resident of the United States of America and of the County of Davidson, Tennessee and was employed in the Nashville Division of the Middle District of Tennessee.

5. Defendant Metropolitan Government of Nashville & Davidson County acting by and through the Electric Power Board of said Government d/b/a Nashville Electric Service (hereinafter "Defendant" or "NES") is the municipal entity who employed Ms. Springer in Davidson County, Tennessee, which is located in the Nashville Division of the Middle District of Tennessee.

6. NES is an employer within the meaning of the ADA, as NES employs more than fifteen (15) employees.

## ADMINISTRATIVE PROCEDURES

7. Plaintiff timely filed a Charge of Discrimination with the Equal Employment Opportunity Commission (hereinafter "EEOC").

8. Plaintiff's EEOC Charge No. 494-2018-02836, filed on August 30, 2018, is attached hereto as Exhibit A.

9. Plaintiff received an EEOC Notice of Right to Sue dated September 10, 2019. A copy of Plaintiff's Notice of Right to Sue is attached hereto as Exhibit B.

10. Plaintiff and Defendant entered into a Tolling Agreement to determine whether a pre-litigation resolution could be reached.

11. The Tolling Agreement extended the ninety (90) day period from Plaintiff's receipt of her EEOC Notice of Right to Sue deadline to March 8, 2020.2

## STATEMENT OF FACTS

12. In 2012, Ms. Springer began her employment with NES as a Bilingual Service Advisor I-Trainee.

13. In 2014, Ms. Springer was promoted to the position of Bilingual Customer Service Advisor II with NES.

14. Ms. Springer's position required her to assist NES customers with establishing / disconnecting service, service requests, and other related tasks.

15. Ms. Springer suffers from bilateral otosclerosis, which has caused severe hearing loss in her right ear and moderate hearing loss in her left ear.

16. In or about 2014, Ms. Springer underwent an unsuccessful surgery in an attempt to improve and / or restore her hearing.

17. Following this unsuccessful surgery, Ms. Springer began requesting certain reasonable accommodations related to her hearing loss and resulting difficulty in hearing customers using NES's standard telephone systems.

18. In or about 2016, Ms. Springer began requesting alternative reasonable accommodations.

19. Ms. Springer took the initiative in providing NES with potential options for accommodations.

20. In or around December 2016, Ms. Springer presented the possibility of an accommodation whereby she could modify her job responsibilities to answering in-person customer requests (given that she was adept in "reading lips" to communicate) as well as customer service requests submitted in writing.

21. NES agreed to the accommodation, modifying Ms. Springer's job responsibilities to include answering mail, email, and faxes, and assisting in the placement of orders for service to newly-constructed homes (with her duties eliminated with respect to use of the telephone system).

22. After approximately one (1) month, NES informed Ms. Springer that it was revoking the accommodation to eliminate use of the telephone system as part of her job duties.

23. Instead, NES unilaterally modified Ms. Springer's job duties to require her to use the telephone system on a limited basis while continuing to perform her in-person and written customer service duties.

24. While Ms. Springer's use of the telephone system was limited (typically less than a couple of hours per day), she continued to seek accommodations from NES which would allow her to perform her job effectively.

25. In or about December 2016, Ms. Springer had provided NES with information from her doctor about a hearing aid / Bluetooth system as an accommodation; however, NES was not willing to provide the accommodation.

26. With her accommodation having been revoked and NES again requiring limited use of the telephone system, Ms. Springer attempted to achieve an accommodation through the use of amplification devices, equalizers, and noise-cancelling headsets.

27. While the technology at the time helped in some respects, it was inadequate to fully accommodate Ms. Springer's unencumbered use of the NES telephone system.

28. On or about July 21, 2017, Ms. Springer informed NES that her doctor had submitted paperwork for Ms. Springer to receive a captioned telephone designed for hearing impaired individuals.

29. More specifically, Ms. Springer's doctor had submitted paperwork for Ms. Springer to receive a CapTel phone, a communications service provided for hearing-impaired individuals through a federally funded program under the regulation of the Federal Communications Commission (FCC).

30. With a CapTel phone, the audio of the call is transcribed onto a monitor that can be read by the hearing-impaired individual.

31. For example, the CapTel phone would have, in theory, transcribed the audio from the NES customers onto a monitor that Ms. Springer could read to allow her to effectively perform any duties requiring the use of a telephone.

32. Following Ms. Springer's request, NES contacted CapTel with questions to evaluate whether it would allow Ms. Springer to use the service, including specifically whether NES could maintain Payment Card Industry ("PCI") compliance with the use of a CapTel phone.

33. Upon information and belief, NES inquired about the compliance of CapTel with PCI, as Ms. Springer would periodically need to capture credit card and / or debit card information from customers.

34. CapTel informed NES that its phone could, in fact, be used in compliance with PCI regulations.

35. Upon information and belief, not only can a CapTel phones be used in compliance with PCI regulations, but they also comply with other major privacy acts, including the Health Insurance Portability and Accountability Act (HIPAA).

36. CapTel further informed NES that its phones for hearing-impaired individuals are approved for employees in various state and federal government agencies with access to sensitive and confidential information.

37. Despite these assurances, NES informed Ms. Springer that it would not allow her to use the CapTel service as an accommodation.

38. In a memorandum dated August 31, 2017, NES's management noted that it had informed Ms. Springer she would not be allowed to use the CapTel service because "it was not equipped or able to secure the customer information" – this was a blatant misrepresentation of the information NES was provided regarding the use of a CapTel phone.

39. Upon information and belief, CapTel has further confirmed that, even if there were security concerns, the phone system's captioning capability can easily be shut off by the user at the point any payment information is provided.

40. Upon further information and belief, NES customers select from an automated menu of options when calling NES for assistance.

41. One such menu option is for payment to NES, and selection of this option transfers the caller to the payment group.

42. NES has the ability to control what menu selections are routed to employees' phone lines on an individualize basis.

43. For example, NES has the ability to divert calls from users who select the payment option from Ms. Springer's phone line.

44. In the rare instance NES callers asked to make a payment while speaking with Ms. Springer about an unrelated customer service issue, that call could be transferred to the payment group.

45. Quite simply, Ms. Springer could have been, and should have been, accommodated by being permitted to use a CapTel phone.

46. Ms. Springer could have further been accommodated by NES diverting phone calls from users selecting the menu option for payment from Ms. Springer's phone line.

47. Ms. Springer could have further been accommodated by being permitted to use a CapTel phone and transferring a customer to the payment group if they wished to make a payment.

48. Even assuming NES had legitimate security concerns with the CapTel technology, Ms. Springer could have been accommodated by being permitted to use a CapTel phone and turning off the captioning functionality in the rare instance a customer needed to provide payment information to Ms. Springer.

49. Ms. Springer could also have been accommodated by NES transferring her to another position which did not require the use of the telephone system or by not revoking its initial accommodation which limited Ms. Springer's job duties to in-person and written customer service.

50. Despite multiple, reasonable accommodations being available, NES failed to provide Ms. Springer with a reasonable accommodation.

7

Case 3:20-cv-00202   Document 1   Filed 03/08/20   Page 7 of 12 PageID #: 7

51. NES would not agree to allow Ms. Springer to use the telephone captioning technology for hearing-impaired individuals and refused to modify her job duties to eliminate the requirement that she spend a limited amount of time each day on the telephone system.

52. Ms. Springer was required to submit an application for disability leave.

53. When submitting the application, Ms. Springer informed NES that she wished to continue working and, if they could just make some accommodation with respect to her use of the telephone system, she was fully capable of performing every other job duty.

54. NES, however, informed Ms. Springer that she "[couldn't] have it both ways."

55. As a result, Ms. Springer was placed on disability leave on or about November 16, 2017.

56. Following NES's failure to provide a reasonable accommodation and her being forced into disability leave, Ms. Springer filed a Charge of Discrimination with the EEOC in or about August 2018 (Charge No. 494-2018-02836).

57. As a result of the EEOC investigation, Ms. Springer discovered documented evidence that NES had misrepresented certain limitations and concerns with respect to the CapTel phone service.

58. During the pendency of the EEOC investigation and the time since, Ms. Springer, through counsel, has made repeated requests for NES to re-evaluate accommodation options and / or place her in an available position that does not require use of the phones.

59. NES, through counsel, has repeatedly denied those requests, even going so far as to state that Ms. Springer has been "accommodated" by being placed on long-term disability leave.

60. As of the time of the filing of this Complaint, Ms. Springer remains on disability leave with NES.

61. Based upon the aforementioned actions and/or omissions by the Defendants, Ms. Springer was discriminated against, and continues to be discriminated against, because of her disability (bilateral otosclerosis), including, but not limited to, the failure to make reasonable accommodations and the termination of her employment, constructive discharge, and/or the adverse employment action of forcing Ms. Springer into disability leave in violation of the Americans with Disabilities Act of 1990.

62. Ms. Springer has also been retaliated against, and continues to be retaliated against, in violation of the the Americans with Disabilities Act of 1990, by NES failing to make reasonable accommodations and terminating her employment, constructively discharging Ms. Springer, and / or the adverse employment action of forcing Ms. Springer into disability leave in violation of the Americans with Disabilities Act of 1990.

## COUNT I
**(Discrimination by Disparate Treatment and / or Disparate Impact under the Americans with Disabilities Act)**

63. Plaintiff hereby incorporates by reference the allegations contained in paragraphs 1-62 as if set forth herein.

64. Plaintiff avers that the Defendant discriminated against Plaintiff by singling her out and treating her differently, including terminating and / or constructively discharging her from her employment (and / or the adverse employment action of forcing Plaintiff into disability leave), because she suffered a physical impairment which limits or limited one or more major life activities.

65. Plaintiff avers that the Defendant discriminated against Plaintiff and others with a like disability by implementing policies with a discriminatory impact on hearing-impaired job candidates and employees, including, but not limited to, refusing to allow customer service employees to use captioning telephones and requiring customer service representatives to process payment information during a customer service call rather than directing the customer to the designated group to process payments.

66. Plaintiff avers that at all times she could, with or without reasonable accommodations, perform the essential functions of the position in which she was employed by Defendant.

67. Plaintiff avers that Defendant's actions and / or omissions were unlawful and in violation of the Americans with Disabilities Act of 1990.

## COUNT II
**(Failure to Accommodate under the Americans with Disabilities Act)**

68. Plaintiff hereby incorporates by reference the allegations contained in paragraphs 1-67 as if set forth herein.

69. While employed with the Defendant, Plaintiff requested accommodations that were reasonable and aimed at allowing her to continue to perform the essential functions of her job with the Defendant.

70. Defendant denied Plaintiff's requests and failed to engage in an interactive process with Plaintiff aimed at identifying a reasonable accommodation that would have allowed her to perform the essential functions of her job with the Defendant.

71. Plaintiff avers that Defendant's actions and/or omissions were unlawful and in violation of the Americans with Disabilities Act of 1990.

## COUNT III
### (Retaliation in Violation of the Americans with Disabilities Act)

72. Plaintiff hereby incorporates by reference the allegations contained in paragraphs 1-71 as if set forth herein.

73. On more than one occasion, Plaintiff requested accommodations that were reasonable and aimed at allowing her to continue to perform the essential functions of job with Defendant.

74. Following her requests for accommodations and her filing of and participation in process of the EEOC Charge of Discrimination, Plaintiff was denied the engagement of the Defendant in the interactive process, denied attempts at reasonable accommodation(s), and ultimately had her employment terminated and / or eliminated and / or suffered the adverse employment action of forcing Ms. Springer into disability leave for her engaging in said protected activity.

75. Plaintiff avers that Defendant's actions and / or omissions were unlawful and retaliatory and in violation of the Americans with Disabilities Act of 1990.

### PRAYER FOR RELIEF

**WHEREFORE**, the foregoing averments considered, Plaintiff demands judgment against the Defendant as follows:

(A) Declaratory judgment that Defendant's employment practices, policies, procedures, conditions and customs are violative of the rights of the Plaintiff as secured by the Americans with Disabilities Act of 1990;

(B) Grant the Plaintiff a permanent injunction enjoining the Defendant, its agents, successors, employees, attorneys and those acting in concert with the Defendant and at the Defendant's request from continuing to violate the the Americans with Disabilities Act of 1990;

(C)     Enter an Order requiring the Defendant to make the Plaintiff whole by awarding her compensatory damages, including, but not limited to, reinstating her, awarding her backpay (plus interest), front pay, nominal, lost seniority, loss of benefits, damages for mental anguish and emotional distress (as the result of Plaintiff's embarrassment, humiliation, and trauma), as well as punitive damages;

(D)     The Plaintiff prays for such other relief and benefits as the cause of justice may require, including, but not limited to, an award of costs, attorneys' fees and expenses;

(E)     Such other relief that this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands trial by struck jury of all issues in this Complaint.

Respectfully Submitted,

s/ *Dustin J. Kittle*
Dustin J. Kittle (BPR 032660)
*Attorney for Norma Springer*

**OF COUNSEL:**

**HUMBLE LAW, LLC**
3112 Blue Lake Drive, Suite 100
Birmingham, Alabama 35243
Phone: (205) 358-3100
Fax: (205) 358-3033
dustin@humble.law


**DEFENDANT TO BE SERVED VIA CERTIFIED MAIL:**

Zan Blue
Constangy, Brooks, Smith & Prophete, LLP
Counsel for Defendant
SunTrust Plaza
401 Commerce Street
Suite 1010
Nashville, Tennessee 37219